799 A.2d 41 (2002)
351 N.J. Super. 536
Ted ROGOZINSKI and Aneta, Rogozinski, his wife, Plaintiffs,
v.
Benjamin D. TURS, Jr., Defendant.
Superior Court of New Jersey, Law Division.
March 14, 2002.
*44 Kathleen M. Berenbroick, Fort Lee, for defendant, Law Offices of Alan R. Fodge attorneys.
August R. Soltis, Passaic, for plaintiff. *42
*43 YANNOTTI, J.S.C.
This matter is before the Court on a motion by the defendant Benjamin D. Turs, Jr. for summary judgment. For the reasons that follow, the defendant's motion will be granted and the complaint dismissed.

I
In this action, the plaintiff Ted Rogozinski seeks damages for injuries sustained in an automobile accident that occurred on March 19, 2000. In his certification, the plaintiff states that his vehicle was struck in the rear by the vehicle driven by the defendant. The plaintiff states, "The impact to the rear of my vehicle was very forceful and propelled my vehicle a substantial distance forward. Additionally, my entire torso, from my head to my waist, was thrust forward and backward and I struck the head restraint with my neck in the impact sequence." Certification of Ted Rogozinski, at 2. The plaintiff states that immediately after the accident, he felt pain in his neck, lower back and in his groin area, mostly on the left side. Id. at 3.
After the accident, the plaintiff was transported to The General Hospital Center in Passaic. He was examined and released. The Hospital's records state that the examination of the plaintiff "shows that your back pain is most likely caused by a strain of the muscles or ligaments that support the spine. This is a very common injury. Back strains cause pain and trouble moving because of muscle spasms. They may take several weeks to heal, although they are usually much better after 2-3 days." Discharge Instructions for Ted Rogozinski, March 19, 2000.
The plaintiff then began a course of treatment on March 27, 2000 with Dr. George Hermann. The treatment included *45 physical therapy through October 17, 2000.
On March 28, 2000, MRIs was taken of the plaintiff's hip and the plaintiff's cervical and lumbar spine. The MRI revealed "left hip joint effusion... small right hip joint effusion.[1] The MRI of the lumbar spine was found to be normal. The report by Dr. Paul H. Pevsner states:
The conus medullaris, vertebral body heights and vertebral marrow signals are normal. There are no degenerated or herniated disks. There is no spinal stenosis. The vertebral bodies are normal. No evidence of metastatic disease is seen. No fracture, subluxation or dislocation is identified. [Report of Open MRI of Englewood Cliffs, dated March 28, 2000].
The MRI of the cervical spine revealed desiccation of the disks at all levels from C2-C3 to C4-C5 but no herniated disks. Ibid.
X-rays were taken of the plaintiff's lumbar spine. The report concerning these x-rays states, "No evidence of fracture or dislocation. Slight facet hypertrophic charges are seen bilaterally at L5-S1." X-rays were also taken of the plaintiff's cervical spine. The report regarding these x-rays states, "No evidence of fracture or dislocation. Spondylotic charges with narrowed disc spaces seen at C7-T1 level." Reports of Medscan Diagnostic Imaging, dated October 18, 2000.
The plaintiff underwent NCV and EMG testing. A report regarding these tests was prepared by Dr. Joseph Cheu. In the report, Dr. Cheu states that the EMG tests revealed abnormal lumbar, left moderate sub-acute L5-S1 radiculopathy.[2] The EMG of the cervical spine was normal without any evidence of radiculopathy. The NCV tests of the lumbar nerves revealed normal amplitude with the exception of left peroneal motor nerves. The left peroneal F-wave was not normal.[3] The cervical nerve conduction study was normal with the exception of the right median F-wave. Report of Dr. Cheu, dated June 19, 2000.
Dr. Hermann recommended that the plaintiff see a Dr. Mauro and Dr. Licitra. The plaintiff did not follow this recommendation.
Dr. Hermann provided the following diagnosis:
Chronic post traumatic cervical derangement secondary to desiccation of the discs at all levels from C2-3 through C4-5; chronic post-traumatic lumbar spine sprain/strain with muscle spasm; left hip joint effusion; radiculopathy at the level of L5-S1 on the left; left peroneal motor nerve conduction delay; right median nerve conduction delay; post-traumatic concussive syndrome with headaches and dizziness; post-traumatic stress anxiety disorder.
Dr. Hermann stated the following with regard to permanency. The plaintiff will have "neck pain, stiffness weather sensitivity; left hip pain, stiffness and weather sensitivity; lower back pain, stiffness, weather sensitivity; headaches; recurrent anxiety insomnia secondary to trauma."
The plaintiff began a course of chiropractic treatment on October 11, 2000 with *46 Peter M. Ferraro, D.C. The treatment ended on January 25, 2001. That is the last date the plaintiff received treatment for his injuries.
Dr. Ferraro has furnished a report, dated March 15, 2001. In that report, Dr. Ferraro stated that he examined the plaintiff's cervical spine and found that the plaintiff's range of motion was limited. He observed "deep spasm." In addition, Dr. Ferraro examined the plaintiff's lumbar spine and determined that the plaintiff's range of motion was limited, particularly in extension. The doctor observed "deep spasm." Dr. Ferraro concluded in his report that the fibrotic repair of the once injured tissues will leave them permanently weakened and less elastic than uninjured tissues. The once injured tissues will be more sensitive to the stresses and strains of daily living. There will be further degeneration of the discs. Adhesions will develop at the site of ligaments and tendon attachments. Scar tissue will form and will result in a loss of the normal range of motion. The supporting tissues will become lax and this will give rise to "spinal instability." The doctor added, "This unstable condition allows misalignment of the vertebral bodies, posterior joints, and the involved spinal segment then compresses emitting posterior nerve roots by pincer type movement."
The plaintiff selected the verbal threshold under his automobile policy. The policy was effective on or after September 24, 1999. The defendant contends that the plaintiff's injuries do not meet the verbal threshold and, on that basis, moves for summary judgment.

II
The verbal threshold law, as amended by the Automobile Insurance Cost Reduction Act of 1998, L. 1998, c. 21 (AICRA), provides that individuals who elect coverage with the verbal threshold, or who are subject to the threshold as a matter of law, may bring actions seeking non-economic losses resulting from injuries arising out of the operation of a private passenger automobile only if the injuries in question meet certain criteria.
A person subject to the limitation on lawsuit threshold may bring a lawsuit for non-economic damages only if the individual sustains bodily injury, resulting from the operation of an automobile in this State, which results in death, dismemberment, significant disfigurement or significant scarring, displaced fractures or a permanent injury within a reasonable degree of medical probability, other than scarring and disfigurement. The statute further provides that an injury will be considered permanent when the body part or organ, or both, has not healed to function normally and will not heal to function normally with further medical treatment. N.J.S.A. 39:6A-8 (a).
AICRA additionally provides that, in order to satisfy the limitation on lawsuit threshold in N.J.S.A. 39:6A-8 (a), the plaintiff must, within 60 days filing the date of the answer to the complaint, provide the defendant with a certification from the licensed treating physician or a board-certified licensed physician to whom the plaintiff was referred by the treating physician. The statute provides:
The certification shall state, under penalty of perjury, that the plaintiff sustained an injury described above. The certification shall be based upon and refer to objective clinical evidence, which may include medical testing, .... such testing may not be experimental in nature or dependent entirely upon subjective patient response .... [Ibid.].
The amendments to the verbal threshold law resulting from the enactment of AICRA *47 took effect on March 22, 1999. See NJ Coalition of Health Care v. DOBI, 323 N.J.Super. 207, 228, 732 A.2d 1063 (App. Div.), certif. den., 162 N.J. 485, 744 A.2d 1208 (1999).
As the Supreme Court explained in Oswin v. Shaw, 129 N.J. 290, 295-97, 609 A.2d 415 (1992), the verbal threshold was initially made a part of this State's no fault automobile insurance system in 1988 as a means to contain the rising cost of auto insurance in New Jersey. Previously, the no fault law allowed policyholders to elect coverage with one of two monetary thresholds for bringing lawsuits. Because the cost of automobile insurance continued to increase despite the monetary thresholds, the law was amended in 1988 to permit policyholders to elect coverage with a verbal threshold or coverage with no limitation on the right to bring an action seeking damages for non-economic losses. L. 1988, c. 119; Oswin v. Shaw, 129 N.J. at 295-97, 609 A.2d 415.
The verbal threshold as enacted in 1988 provided that recovery for non-economic losses was only permitted for injuries that came within nine defined categories: death; dismemberment; fractures; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential use of a body organ or member; significant limitation of use of a body function or system; or an injury or impairment which prevented the plaintiff from performing certain activities for 90 days during the 180 days immediately following the accident. N.J.S.A. 39:6A-8 (a).
In Oswin v. Shaw, the Supreme Court noted that New Jersey's verbal threshold was modeled on a similar law in New York. The New York law required that the plaintiff show a "serious" injury in order to meet the verbal threshold. Although the New Jersey law did not use that term, the Court nevertheless applied the standards under the New York law in its interpretation of New Jersey's threshold. Oswin v. Shaw, 129 N.J. at 315, 609 A.2d 415. The Court explained that in considering whether an injury was "serious," the Court would examine the policies and purposes underlying the verbal threshold. The policies to be advanced by the verbal threshold are to limit the amount of litigation and to "hold down" the cost of auto insurance. Id. at 318, 609 A.2d 415.
The Supreme Court in Oswin stated that, in order to qualify under the verbal threshold as enacted in 1988, the plaintiff must show a nexus between the injury and the disability. Standing alone, the injury is not sufficient to meet the statutory definition. The resulting loss and the disability are the keys to determining whether the threshold has been met. Ibid. The plaintiff must show that the injury has had a serious impact upon the plaintiff and the plaintiff's life. Ibid.
Despite the enactment of the verbal threshold in 1988, and other measures to contain the cost of auto insurance, premiums charged to policyholders continued to rise. AICRA was intended to reduce the cost of auto insurance to the consumer. Indeed, AICRA specifically mandates the reduction in rates for certain categories of coverage and for certain policyholders. See NJ Coalition of Health Care v. DOBI, supra.
In its findings in AICRA, the Legislature stated that the automobile insurance system enacted in 1972 had provided valuable benefits to New Jersey residents, but since the enactment of the verbal threshold in 1988, there had been a substantial increase in the cost of medical expense benefits. This indicated, the Legislature expressly found, that the benefits are being over-utilized for the purpose of gaining *48 standing to sue for pain and suffering, thus undermining the limitations imposed by the threshold and necessitating the imposition of further controls on the use of those benefits, ... N.J.S.A. 39:6A-1.1(b).
In addition, the Legislature found that the philosophical basis of the no fault system was a trade off of the right to sue for non-serious injuries in exchange for the payment of medical benefits. The Legislature stated that the cost of providing the medical benefits must be offset by a reduction in the cost of other types of coverage, most notably a restriction on the right of persons who have non-permanent or non-serious injuries to sue for pain and suffering;... Ibid. The Legislature stated:
To meet these goals, the legislation provides for the creation of two insurance coverage options, a basic policy and a standard policy, provides for cost containment of medical expense benefits through a revised dispute resolution proceeding, provides for a revised lawsuit threshold for suits for pain and suffering which will eliminate suits for injuries which are not serious or permanent, including those for soft tissue injuries, would more precisely define the benefits available under the medical expense benefits coverage, and establishes standard treatment and diagnostic procedures against which the medical necessity of treatments reimbursable under medical expense benefits coverage would be judged; ... [Ibid.; emphasis added].
The Legislature's findings were enacted as part of AICRA. The findings are part of the statutory scheme and are the best indication of the Legislature's intention in enacting this particular law. The Legislature's stated purpose is the key to the interpretation of any law. GE Solid State, Inc. v. Director, Division of Taxation, 132 N.J. 298, 308, 625 A.2d 468 (1993).
Furthermore, in ascertaining the intent of the Legislature in passing AICRA, the Court may also look to Governor Whitman's conditional veto message which was issued when the Governor returned Senate Bill No. 3 to the Legislature for reconsideration. NJ Coalition of Health Care v. DOBI, 323 N.J.Super. at 238, 732 A.2d 1063. Governor Whitman stated that the verbal threshold as enacted in 1988 had not achieved its purpose because it allowed recovery for injuries that were not permanent. The Governor found that the verbal threshold had not controlled premium costs. See Governor's Conditional Veto Message, Senate Bill No. 3.
As stated previously, in AICRA the Legislature added the certification requirement to the limitation on lawsuit threshold to further its overriding legislative purpose to achieve cost savings by limiting the types of injuries for which actions may be brought for pain and suffering. In her conditional veto message, Governor Whitman commented upon the certification requirement. The Governor stated that:
Complementing the tightened lawsuit threshold in controlling premium costs are several measures designed to combat fraud. First, every complaint in a pain and suffering lawsuit brought under the lawsuit threshold must be accompanied by a certification from the treating physician attesting the seriousness of the plaintiff s condition ...The certification is intended as an anti-fraud measure to assure legitimacy. It is necessary to state a claim, not sufficient to establish one, and will be subject to challenge through the normal discovery and summary judgment processes. [Ibid.; emphasis added].
Although AICRA amended the verbal threshold to redefine the types of *49 injuries that would allow an individual to bring a lawsuit seeking non-economic damages, the purposes of the law remain the sameto limit lawsuits and to hold down the cost of auto insurance. AICRA was intended to "tighten" the verbal threshold and to limit the number of lawsuits brought seeking non-economic injuries arising out of automobile accidents. In the certification required by AICRA, the physician must attest to the "seriousness" of the plaintiff's injury. The injuries must be permanent and, as under the 1988 law, the injuries must be serious.
Because AICRA reflects an intention to "tighten" the threshold and further restrict lawsuits arising from automobile accidents to claims for injuries that are permanent and serious, AICRA does not reflect an intention to modify the essential holdings of Oswin v. Shaw. Therefore, the plaintiff must show, by the presentation of objective credible evidence, that the injuries come within one of the categories of injuries defined in the amendatory legislation. In addition, the plaintiff must show that the injuries have had a serious impact upon the plaintiff's life.
The plaintiff argues that under the new limitation on lawsuit threshold, the plaintiff may surmount the threshold by showing evidence of any "permanent injury within a reasonable degree of medical probability" and need not show that the particular injury is serious. The plaintiff argues that a permanent injury can be shown, with a reasonable degree of medical probability, if a body part or organ has not recovered to "function normally." The plaintiff argues that the new statute has essentially repealed Oswin's requirement that the injury have a serious impact upon the plaintiff and the plaintiff's life.
These contentions are not persuasive. There is nothing in the legislative history that supports the contention that the purpose of AICRA was to change the pre-AICRA requirement that an injury be serious in order to meet the threshold. The Legislature is presumed to be thoroughly conversant with its own prior enactments and the statutory interpretations provided by the courts. F.M.C. Stores Co. v. Borough of Morris Plains, 195 N.J.Super. 373, 389, 479 A.2d 435 (App.Div.1984), aff'd, 100 N.J. 418, 495 A.2d 1313 (1985). The Legislature amended N.J.S.A. 39:6A-8(a) to redefine the categories of injuries in the verbal threshold. But there is nothing in the language of the amended statute that reflects an intention on the part of the Legislature to alter the requirement under Oswin v. Shaw that the injuries have a serious impact upon the plaintiff and the plaintiff's life.
Indeed, such a conclusion would be contrary to the clear expression of Legislative intent in the findings that were enacted as part of AICRA. The Legislature explicitly stated that the revised lawsuit threshold is intended to "eliminate suits for injuries that are not serious or permanent." N.J.S.A. 39:6A-1.1 (b). Moreover, Governor Whitman made clear in her conditional veto that the tightened threshold is intended to limit lawsuits to injuries that are "serious and permanent." There could not be a clearer expression of intent on the part of the Legislature and the Governor to adhere to the principles of Oswin which require a showing by the plaintiff that the injuries are serious.
The plaintiff's assertion is also contrary to one of the purposes of the law which is to limit lawsuits. The new threshold eliminates all lawsuits for injuries that are not permanent. However, under plaintiff's interpretation, the threshold would allow lawsuits for permanent injuries that are not genuinely serious, thereby allowing for the maintenance of a greater number of lawsuits for permanent injuries than were *50 permitted under the pre-AICRA threshold. The Court is not persuaded that the Legislature intended to allow for an increase in the number of lawsuits for permanent injuries since such a reading of the law would be at variance with the expressed purpose of the law.
In addition, the plaintiff's interpretation of the law would undermine the other stated purpose of the law, which is to hold down or reduce the cost of automobile insurance. It is self evident that with more lawsuits come higher costs. Any interpretation of AICRA that allows more lawsuits to be maintained for injuries sustained in auto accidents would undermine the Legislature's expressed purpose.
Therefore, the Court finds that in order to meet the limitation of lawsuit threshold under N.J.S.A. 39:6A-8 (a), as amended by AICRA, the plaintiff must present evidence of an injury that meets the statutory definition of a serious and permanent injury. The injury must be one that has had and will have a serious impact upon the plaintiff and the plaintiff's life.

III
The Supreme Court in Oswin v. Shaw held that when a motion for summary judgment is made seeking dismissal of an action on the grounds that the particular injuries at issue do not qualify under the verbal threshold statute, the motion judge must determine whether the alleged injuries would, if believed by the fact finder, meet the requirements of the law. The Court must address two questions: whether the plaintiff's injuries fall within any of the nine categories of the statute and, if so, whether the evidence demonstrates a genuine issue of material fact regarding the nature and extent of the plaintiff's injuries. If the plaintiff's claims survive this analysis, the resolution of the dispute is for the jury. Oswin v. Shaw, 129 N.J. at 307, 609 A.2d 415. The plaintiff argues, however, that under N.J.S.A. 39:6A-8 (a), as amended by AICRA, the plaintiff may survive a motion for summary judgment merely by submitting the certification mandated by AICRA. The plaintiff argues that the certification establishes for purposes of summary judgment that the plaintiff has an injury that comes within one of the categories of injuries in N.J.S.A. 39:6A-8 (a). The plaintiff contends that the Court must accept as true the statements of the physician in the certification and, consequently, the certification alone is sufficient to raise a genuine issue of material fact as to whether the plaintiff meets the verbal threshold.
This assertion is unpersuasive. There is nothing in AICRA that suggests that the certification will be sufficient basis for the plaintiff to raise a genuine issue of material fact as to whether the plaintiff meets the threshold. To the contrary, in her conditional veto message, Governor Whitman stated that the verbal threshold certification is intended in part as an anti-fraud measure to ensure the legitimacy of the plaintiff's claim. The Governor explained that the certification is necessary to state a claim, not establish a claim and the certification will be subject to the usual discovery and summary judgment process.
Indeed, the certification is merely a statement of a conclusion, by a board certified physician, that the plaintiff has sustained an injury that falls within one of the categories of injuries in the statutory threshold. As the statute provides, the certification must be based upon and refer to objective clinical evidence. The factual basis of the certification may, however, be called into question. The conclusion that the plaintiff has sustained a permanent injury as defined in the law may be subject to challenge. All of these *51 issues may properly be raised by the defendant on a motion for summary judgment.
Therefore, in order to survive a motion for summary judgment under the limitation on lawsuit threshold, the plaintiff must raise a genuine issue of material fact as to whether the plaintiff sustained an injury that meets the statutory threshold. R. 4:46-2(c). The plaintiff must show that the injury is a serious injury. To do so, the plaintiff must present objective credible evidence to support the claim. In addition, the plaintiff must show that the injury has had a serious impact on the plaintiff's life. If the plaintiff fails to raise a genuine issue of material fact on these issues, the Court may grant summary judgment in favor of the defendant. Brill v. Guardian Life Insurance Co., 142 N.J. 520, 540, 666 A.2d 146 (1995).
In this case, the plaintiff has alleged that he sustained in this accident "permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement." As stated previously, under the amended threshold, an injury is considered to be a permanent injury "when the body part or organ, or both, has not healed to function normally and will not heal to function normally with further medical treatment." N.J.S.A. 39:6A-8 (a).
A. Evidence of a Permanent Injury
The evidence presented by the plaintiff is insufficient to show that he sustained a serious injury of a permanent nature in the subject automobile accident.
First, the MRI of the cervical spine revealed disc desiccation but the MRI did not reveal any herniations of the discs. Dr. Hermann's diagnosis was of a chronic post-traumatic derangement secondary to desiccation of the discs in the cervical spine. Disc desiccation is evidence of drying of a tissue, and such drying of the tissue is usually considered a degenerative condition, rather than a condition that is the result of some traumatic injury. Montemayor v. Signorelli, 339 N.J.Super. 482, 487, 772 A.2d 940 (App. Div.2001).
Moreover, in his discussion of permanency of the alleged cervical injuries, Dr. Hermann states that the plaintiff will experience pain, stiffness and weather sensitivity. The mere presence of pain and stiffness is not evidence of a significant injury.
The plaintiff underwent EMG and NCS testing. The results of both tests are addressed in Dr. Cheu's report. Dr. Cheu states that the EMG of the cervical spine was normal. The NCS of the cervical spine showed that all nerve conduction was normal with the exception of the right median F-wave. The plaintiff's complaints were of intermittent radiating pain. Intermittent radiating pain is not evidence of a serious permanent injury.
The plaintiff has not shown that his cervical spine, despite some pain and stiffness, does not essentially function normally. The plaintiff has not shown that he has a serious permanent injury of the cervical spine.
Regarding the lumbar spine, the MRI of the plaintiff's lumbar spine revealed that the plaintiff's spine was normal. Dr. Hermann diagnosed the plaintiff as having sprain or strain, with muscle spasm. Sprain or strain is not indicative of a substantial injury of a permanent nature. There is no indication that the spasm is a permanent condition. Dr. Hermann also diagnosed radiculopathy at the L5-S1 level. But the mere presence of some radiating pain at the L5-S1 level is not evidence of a serious permanent injury.
*52 In his discussion of the permanency of the plaintiff's injuries, Dr. Hermann states that the plaintiff will experience lower back pain, stiffness and weather sensitivity. This is also not evidence of a serious injury of a permanent nature.
Dr. Cheu's report also discusses the EMG and the NCS tests of the plaintiff's lumbar spine. These tests are also not evidence of a serious permanent injury. The EMG of the lumbar spine showed a "moderate subacute L5-S1 radiculopathy." The NCS showed all nerves functioning normally with the exception of the left peroneal motor nerve. Dr. Cheu noted the plaintiff's complains as "intermittent radiating pain and weakness in the left lower extremity." "Moderate" radiculapothy, with "intermittent" radiating pain is not evidence of a serious permanent injury.
The plaintiff has not shown that his lower back, despite some pain and stiffness, does not essentially function normally. He has not established that he has a serious permanent injury of his lower back.
Dr. Hermann additionally diagnosed the plaintiff with a left hip joint effusion. This is not a serious injury of a permanent nature. The movement of fluids into the tissue of the hip is not evidence of a permanent injury. Dr. Hermann states that the plaintiff will have left hip pain, stiffness and weather sensitivity. The presence of pain, stiffness and sensitivity to weather is not evidence of a serious permanent injury.
The plaintiff has not shown that his left knee, despite some pain and stiffness, does not essentially function normally.
Dr. Hermann also states that the plaintiff will have headaches and recurrent anxiety secondary to trauma. There is no objective clinical evidence to substantiate the claim regarding the headaches. There is no evidence that the headaches are debilitating in any way. The plaintiff's subjective complaints of headaches is not objective credible evidence of a serious injury for verbal threshold purposes. Oswin v. Shaw, 129 N.J. at 318, 609 A.2d 415.
Similarly, with regard to Dr. Hermann's diagnosis of recurrent anxiety. There is no report from a psychologist or a psychiatrist to support the claim regarding anxiety. There is no objective testing to support this claim. This claim is also based upon the plaintiff's own subjective complaints of anxiety.
The plaintiff also relies upon a report by a chiropractor, Dr. Ferraro. Dr. Ferraro notes that the plaintiff has limitations in the range of motion in his cervical and lumbar spine. However, the Supreme Court in Oswin explained that, "Because most range-of-motion tests are based only on patients' pain responses, they ordinarily will not suffice unless the restricted mobility is verified by physical examination and observation." Oswin, 129 N.J. at 320, 609 A.2d 415.
Dr. Ferraro also explains his prognosis for the plaintiff in his report. He states that, in the future, the plaintiff will experience "symptomatic exacerbations" of his conditions, secondary to stresses and strains put on the injured tissues. Dr. Ferraro explains the basis for this opinion but the bottom line is clear. The plaintiff will experience some pain. The mere presence of some pain, "secondary to stresses and strains" is not evidence of a serious permanent injury that meets the new limitation on lawsuit threshold.
Dr. Ferraro also comments in his report that he observed some muscle spasm when he examined the plaintiff in March 2002, about a year after the accident. But there is no indication in the doctor's report that the muscle spasm will be a permanent *53 condition. There is no indication that the spasm is anything other than a temporary impairment.
In summary, the plaintiff has failed to present sufficient evidence to raise a genuine issue of material fact as to whether he sustained a serious and permanent injury under the new threshold.
B. Life Impact

The plaintiff must also establish that he sustained a serious permanent injury that has and will have a significant impact upon his personal and occupational life. Oswin v. Shaw, supra, 129 N.J. at 318, 609 A.2d 415; Owens v. Kessler, 272 N.J.Super. 225, 231, 639 A.2d 738 (App. Div.1994). The Court must consider all of the alleged limitations, in the totality of the circumstances. Natale v. Kisling, 336 N.J.Super. 198, 203, 764 A.2d 463 (App. Div.2001).
The plaintiff states in his certification that he ended his treatment in January 2001 but he still experiences pain in his neck and back. He states that the pain in his lower back is "fairly constant" and radiates to his left hip and left leg. The left hip hurts on an "ongoing basis" and he takes "substantial amounts" of over the counter painkillers. Rogozinski Certification at 7.
The plaintiff is 34 years old. He states that he finds it hard to bend, run, stand or walk for long periods of time. His ability to drive for long periods of time is "compromised." He states that he cannot run or jog, as he did prior to the accident. He finds it difficult to assist his wife in the performance of household chores, which require moderate to strenuous physical activity. Id. at 8-9.
Although not mentioned in the plaintiff's certification, the plaintiff stated in his answers to interrogatories that he is the Shift Manager at Forest Manufacturing. He missed no time from work due to these injuries. Plaintiff's Answers to Interrogatories, Question 10.
The plaintiff's limitations are not sufficient to meet the second prong of the Oswin test. Despite his claim that he sustained a significant injury, he did not lose any time at work due to the injuries sustained in the accident of March 19, 2000. The plaintiff's statements suggest that he has been limited to some degree in his ability to engage in certain activities by his injuries. The plaintiff states that he cannot run or jog, or do certain household chores, but he has not explained that such activities were a significant part of his life.
However, the plaintiff is apparently still able to engage in virtually all of the activities he engaged in prior to this accident. He may experience some pain in doing so, but that is not sufficient to show a significant impact on the plaintiff's personal life. Phillips v. Phillips, 267 N.J.Super. 305, 318, 631 A.2d 564 (App.Div.1993); see also Weiss v. Thomas, 274 N.J.Super. 37, 46, 643 A.2d 29 (App.Div.1994) (plaintiff s injuries did not qualify under verbal threshold where she complained of pain while working and discomfort when on long airplane flights); Sherry v. Buonansonti, 287 N.J.Super. 518, 521-22, 671 A.2d 606 (App. Div.1996) (limited ability to engage in social dancing and to swim did not constitute a serious impact on plaintiff s life).

IV
For the foregoing reasons, the defendant's motion for summary judgment will be granted and the complaint dismissed.
NOTES
[1] An "effusion" is the escape of fluid from the blood vessels or lymphatics into the tissues. The American Heritage Stedman's Medical Dictionary, Houghton Mifflin, 1995.
[2] "Radiculopthy" is pain which radiates out of the spinal nerves or nerve roots. The American Heritage Stedman's Medical Dictionary, supra.
[3] "Peroneal" relates to the fibula, or the outer portion of the leg. Ibid.